# Illinois Official Reports

## Appellate Court

*National Gun Victims Action Council v. Schecter*, 2016 IL App (1st) 152694

| | |
|---|---|
| Appellate Court Caption | NATIONAL GUN VICTIMS ACTION COUNCIL, an Illinois Not-for-Profit Corporation, and ELLIOT FINEMAN, Plaintiffs-Appellants, v. CLIFFORD D. SCHECTER, LIBERTAS LLC, an Ohio Limited Liability Company, and AARON MINTER a/k/a AARON BLACK, Defendants (Clifford D. Schecter and Libertas LLC, Defendants-Appellees). |
| District & No. | First District, First Division<br>Docket No. 1-15-2694 |
| Rule 23 order filed<br>Rule 23 order<br>withdrawn<br>Opinion filed | October 11, 2016<br><br>November 17, 2016<br>December 5, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-01798; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Anthony S. Hind, of Evanston, for appellants.<br><br>Andrew Kopon Jr. and Vincenzo R. Chimera, of Kopon Airdo, LLC, of Chicago, for appellees. |

Panel
PRESIDING JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Harris and Simon concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiffs, an Illinois resident and an Illinois not-for-profit corporation, appeal the order of the trial court that granted the motion of defendants, an Ohio resident and an Ohio limited liability corporation, to dismiss for lack of personal jurisdiction. Plaintiffs contend that sufficient minimum contacts exist to bring defendants within the jurisdiction of Illinois due to the ongoing business relationship between plaintiffs and defendants that was conducted via Internet-based communications and document exchanges. We disagree and find that defendants' contacts with this state are too attenuated. Requiring defendants to litigate here would offend traditional notions of fair play and substantial justice. Accordingly, we affirm the trial court's dismissal of plaintiffs' complaint for lack of personal jurisdiction.

¶ 2      I. BACKGROUND

¶ 3      The lawsuit from which this appeal stems was filed by plaintiffs, National Gun Victims Action Council (Council), an Illinois not-for-profit corporation, and Elliot Fineman, an Illinois resident, against defendants, Clifford D. Schecter, an Ohio resident, Aaron Minter,[1] a New York resident, and Libertas LLC (Libertas), an Ohio-based limited liability corporation. Fineman is the president and CEO of the Council, which is a not-for-profit corporation consisting of a network of gun victims, survivors, the faith community, and others whose purpose is to change the United States' gun laws through the leverage of economic power. Fineman created the Council after his son was shot and killed in 2006. Schecter is the president of Libertas, whose work encompasses public relations and political strategy.

¶ 4      We have gleaned the operative facts in this matter from plaintiffs' verified complaint, which was filed on February 20, 2015. In their complaint, plaintiffs alleged that they first came into contact with Schecter in May 2013, when the Council retained Schecter to handle public relations and other media support on a matter unrelated to the event from which this litigation stems. For this unrelated matter, Schecter approached plaintiffs regarding services he could provide. In or around May 2014, Fineman approached Schecter to handle public relations for the event at issue here, known as the Kansas City event.[2] Plaintiffs alleged that in June 2014, they orally retained Schecter to handle all the public relations aspects of the Kansas City event for a fee of $3500 per month. The Kansas City event was to be a "newsworthy" gathering of people outside the headquarters of Hallmark Cards, Inc. (Hallmark), in Kansas City, Missouri, demanding that Hallmark meet with the Council and other similar organizations to discuss

---

[1]Service of summons was never obtained against defendant Minter in the underlying action and he is not a party to this appeal.

[2]Plaintiffs refer to the event as the "Hallmark event" and defendants refer to it as the "Kansas City event." We opted to refer to it as the "Kansas City event" because that is the term the trial court used in its order granting defendants' motion to dismiss for lack of personal jurisdiction.

Hallmark's refusal to support and join anti-gun initiatives. It was originally scheduled to take place in August 2014. The complaint stated that Schecter reassured Fineman he could successfully handle all the public relations work, and that he had handled similar events in the past.

¶ 5     The complaint alleges that the Kansas City event resulted from Hallmark's unwillingness to meet with the Council and other similarly-aligned entities to discuss its stance on gun laws. In or around April 2014, the Council and these other philosophically similar organizations sent a letter to Hallmark's CEO requesting a meeting to discuss "the disconnect between (a) statements on the Hallmark website regarding concerns for the welfare of families, children, and community, and (b) Hallmark's public statement that it did not intend to be involved with any anti-gun initiatives." After the letter was sent, Fineman had three conversations with Hallmark's vice president of public affairs and communication, during which Fineman was allegedly told that Hallmark did not get involved in "divisive issues," and that Hallmark would not meet with the Council and others to discuss the issues set forth above. As a result of Hallmark's refusal to meet, the Council called for a boycott of Hallmark products and published free gun violence prevention-focused Father's Day cards on the Council's website, urging people to use those cards instead of Hallmark's cards. Additionally, the Council intended to hold the Kansas City event in order to bring media attention to Hallmark's refusal to meet.

¶ 6     After Schecter was allegedly retained to handle the Kansas City event, he and Fineman engaged in email correspondence. The record contains the following email exchanges:

- May 5, 2014: Email from Schecter to Fineman regarding issues unrelated to the Kansas City event;

- June 1, 2014: Email from Fineman to Schecter regarding an op-ed for a boycott of Hallmark products;

- June 4, 2014 Email from Schecter/Libertas to Fineman/the Council regarding Libertas's June invoice for $3500;

- June 9, 2014: Email exchange between Fineman and Schecter regarding starting a Hallmark-focused petition and beginning of a discussion of the Kansas City event in which Schecter states:

    "If we do Hallmark event, you either need to hire someone to do the whole thing or you need me to do it. If I do it, organizing is a ton of time, as we need a) props b) an organizer on the ground who we have to likely fly in and pay for c) press d) permits taken care of e) a huge online push with Facebook/Twitter/Blogs."

    Schecter also states: "This is well beyond the scope of what we've agreed to, *i.e.*, my doing strict pr, and getting you the results you want. So if I'm gonna [*sic*] do this, I'm going to start by saying I'll need another 3K in addition to what you're paying";

- July 3, 2014: Email exchange regarding July invoice for $6,500.00;

- July 15, 2014: Email from Schecter to Fineman regarding some of the work being done on the Kansas City event and providing information regarding some other organizations' involvement in the event;

- August 8, 2014: Email from Schecter to Fineman with two attachments: (1) overall budget of the Kansas City event and (2) August invoice for $9,500.00. This email referenced the event as taking place in September 2014, not August.

The record does not contain evidence of any other correspondence that may have been sent between Schecter and Fineman. The complaint alleges that numerous phone calls took place. Specifically, the complaint references a phone call in early July 2014, wherein Schecter suggested Fineman also hire defendant Minter to handle some of the items outlined in the June 9, 2014, email regarding what needed to be done for the Kansas City event. In the July 15, 2014, email, Schecter informed Fineman that Minter had agreed to do some of this work. Also, the complaint alleges that in other phone conversations in August 2014, Schecter represented that Minter needed to be "on the ground" in Kansas City for two weeks prior to the event. Sometime in August 2014, the Kansas City event was rescheduled from August to September 2014.

¶ 7 The complaint alleges that on August 21, 2014, Schecter circulated a timeline relating to work preparing for the Kansas City event. The record does not contain this correspondence. Thereafter, the relationship between Fineman, Schecter, and Minter broke down and ultimately dissolved. The complaint states that in early September 2014, Schecter and Minter missed scheduled phone conferences and Minter was not "on the ground" in Kansas City, as previously discussed. Ultimately, Schecter informed plaintiffs that he could not get people to attend the Kansas City event due to its "messaging," he had not obtained the requisite permits, and he had not secured press coverage. Eventually, plaintiffs cancelled the event and rescheduled it to November 12, 2014. At the time of rescheduling the event, plaintiffs had paid Libertas and Minter $31,000. Plaintiffs' complaint references email correspondence from Schecter to Fineman that allegedly occurred on November 7, 2014, but the record does not contain copies of this email. On October 14, 2014, plaintiffs terminated their relationship with Schecter, Libertas, and Minter. Thereafter on February 20, 2015, plaintiffs filed their verified complaint, containing counts for breach of contract, scheme to defraud, civil conspiracy, and unjust enrichment.

¶ 8 Schecter and Libertas (collectively, defendants) filed their appearance on April 20, 2015. On April 30, 2015, defendants filed their motion to dismiss for lack of personal jurisdiction, arguing that neither Schecter nor Libertas were residents of Illinois and did not have sufficient minimum contacts so as to be subject to either specific or general personal jurisdiction in Illinois. Defendants argued that the relevant transaction here was initiated by plaintiffs and the negotiations regarding defendants' services took place over the phone or email, not in Illinois. The event at the center of the parties' relationship was to take place in Missouri, not Illinois, and all pre-event planning by defendants took place in Ohio. Additionally, defendants contended that it would be unreasonable for defendants to be required to litigate in Illinois.

¶ 9 Plaintiffs filed their response to the motion on June 18, 2015, asserting that Illinois had specific personal jurisdiction over defendants via the "on-going business relationship they established with [p]laintiffs" through an Internet-based exchange of communications and documents. Plaintiffs did not argue that general personal jurisdiction applied. Plaintiffs asserted that the Internet and email communications could form the basis for sufficient minimum contacts. Plaintiffs further stated that it was, in fact, defendants who initiated the relationship with plaintiffs. Defendants knew that plaintiffs were Illinois residents and directed their communications at plaintiffs here. Plaintiffs argued that defendants' contacts with Illinois

were not attenuated and instead were "aimed" at this state; thus, it did not matter that defendants never physically entered Illinois. In sum, plaintiffs contended that defendants offered to provide services to Illinois-based plaintiffs, were paid for those services, but never actually performed, resulting in damage that occurred in Illinois to Illinois residents and establishing sufficient minimum contacts.

¶ 10     Defendants' reply was filed on June 26, 2015, wherein they argued that plaintiffs could not establish specific personal jurisdiction because plaintiffs failed to offer evidence establishing that the alleged contract and alleged breach had anything to do with Illinois. Defendants emphasized that the relationship regarding the Kansas City event was initiated when plaintiffs contacted defendants. Additionally, defendants argued that plaintiffs could not show that defendants availed themselves of the benefits of Illinois through email and telephone communications. Finally, defendants contended that requiring them to litigate here would be unfair and unjust because they are both from Ohio, and are alleged to have breached a contract that was for a Missouri event.

¶ 11     Without holding a hearing, the trial court issued a written ruling on July 14, 2015. The court's order indicated that the question before it was whether emails between plaintiffs and defendants, coupled with an uncertain number of telephone calls, were sufficient to establish the minimum contacts requirement for specific personal jurisdiction in Illinois. The court determined that such correspondence was not sufficient. The court pointed out that Fineman and Schecter met face-to-face one time in 2013 in Washington D.C. prior to the formation of the relationship for the Kansas City event. Regarding the Kansas City event, plaintiffs reached out to defendants and defendants did not solicit plaintiffs' business. Also, defendants never entered Illinois and none of the services were performed in Illinois. During their relationship regarding the Kansas City event, plaintiffs and defendants only communicated via telephone and email. Ultimately, the court determined that plaintiffs had the burden of establishing a *prima facie* case for jurisdiction and failed to do so. Thus, defendants' motion to dismiss was granted.

¶ 12     On August 18, 2015, the trial court entered an order voluntarily dismissing defendant Minter from this case, disposing of the entire case. As a result, the court found that language pursuant to Illinois Supreme Court Rule 304(a) was inapplicable. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010) (allowing a party to appeal from a final judgment "as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both"). Plaintiffs filed their timely notice of appeal on September 17, 2015.

¶ 13                                        II. ANALYSIS

¶ 14     On appeal, plaintiffs argue that the trial court erred in finding a lack of specific personal jurisdiction over defendants. Specifically, plaintiffs argue that defendants have sufficient minimum contacts with Illinois such that a finding of specific jurisdiction would comport with notions of fair play and substantial justice due to, *inter alia*, defendants' knowledge that plaintiffs were Illinois residents and defendants' conduct was "aimed" at Illinois. Defendants respond that the limited email communications between the parties here do not amount to sufficient contacts. Additionally, defendants point out that plaintiffs sought defendants' services for the Kansas City event, which was set to take place in a state other than Illinois. We

agree with defendants' position and find that there were not sufficient minimum contacts to justify personal jurisdiction over defendants in Illinois.

¶ 15    Our review when the circuit court decides a jurisdictional question solely on the basis of documentary evidence is *de novo*. *Cardenas Marketing Network, Inc. v. Pabon*, 2012 IL App (1st) 111645, ¶ 28.

¶ 16    It is the plaintiff's burden to establish a *prima facie* case for personal jurisdiction over the defendant. *Id.* Section 2-209 of the Code of Civil Procedure, known as the Illinois long-arm statute, sets forth the grounds for when Illinois courts can exercise personal jurisdiction over a nonresident defendant. 735 ILCS 5/2-209 (West 2012). Relevant here, section 2-209(c) is a catchall provision, which permits Illinois courts to "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c) (West 2012). "Accordingly, if the contacts between a defendant and Illinois are sufficient to satisfy both federal and state due process concerns, the requirements of Illinois' long-arm statute have been met, and no other inquiry is necessary." (Internal quotation marks omitted.) *Cardenas*, 2012 IL App (1st) 111645, ¶ 29. State due process requires that it be fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois and that courts take into consideration the quality and nature of the defendant's actions that take place in Illinois or that affect interests located in Illinois. *Wiggen v. Wiggen*, 2011 IL App (2d) 100982, ¶ 22. Further, federal due process analysis requires courts to consider whether: "(1) the nonresident defendant had minimum contacts with the forum state such that there was fair warning that the nonresident defendant may be haled into court there; (2) the action arose out of or related to the defendant's contacts with the forum state; and (3) it is reasonable to require the defendant to litigate in the forum state." (Internal quotation marks omitted.) *Id.*

¶ 17    At issue here is whether defendants had sufficient minimum contacts with Illinois so as to justify personal jurisdiction over them. For personal jurisdiction to comport with the requirements of federal due process, the defendant must have sufficient minimum contacts with the forum state so that maintaining the suit in the forum state does not offend traditional notions of fair play and substantial justice. *Innovative Garage Door Co. v. High Ranking Domains, LLC*, 2012 IL App (2d) 120117, ¶ 16. Because plaintiffs have not argued that general jurisdiction[3] applies, we limit our review to specific jurisdiction. For specific jurisdiction, the suit must derive directly from the contacts between the defendant and the forum state. *Wiggen*, 2011 IL App (2d) 100982, ¶ 29. "The focus is on the defendant's activities within the forum State, not on those of the plaintiff." (Internal quotation marks omitted.) *Id.*

¶ 18    In order to determine whether a defendant has transacted business in such a manner so as to have purposefully availed himself of the benefits of Illinois law, a court must look to the following factors: (1) who initiated the transaction, (2) where the contract was formed, and (3)

---

[3]"General jurisdiction can be found when the defendant has continuous and systematic general business contacts with the forum." (Internal quotation marks omitted.) *Wiggen*, 2011 IL App (2d) 100982, ¶ 26. "That standard requires a nonresident defendant to carry on business activity in Illinois, not occasionally or casually, but with a fair measure of permanence and continuity." (Internal quotation marks omitted.) *Id.*

where performance of the contract was to take place. *Innovative Garage Door Co.*, 2012 IL App (2d) 120117, ¶ 28.

¶ 19 Prior to applying these three factors, we examine *Innovative*, the case upon which plaintiffs primarily rely as support for their position that the trial court erred in granting defendants' motion to dismiss. In that case, the plaintiff, an Illinois garage door repair and installation company, filed a breach of contract suit against the defendant, an Arizona company whose business consisted of websites designed to solicit inquires from people seeking handyman, plumbing, or garage door services, which they then sold to companies throughout the United States. *Id.* ¶ 3. Because the defendant did not have any offices in Illinois, did not travel to Illinois, and did not maintain business activities in Illinois, the trial court granted the defendant's motion to dismiss for lack of personal jurisdiction. *Id.* ¶ 8.

¶ 20 On appeal, the Second District reversed, holding that "[the defendant's] maintenance of a commercial website directed at this state, which is related to the subject matter of this litigation, in addition to its entering into a contract to provide an Illinois business with leads to predominantly Illinois customers, is a sufficient basis for specific personal jurisdiction in this case." *Id.* ¶ 27. The *Innovative* court relied on the United States Supreme Court's holding in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), "that specific personal jurisdiction exists where a defendant has 'purposefully directed' his or her activities at the forum state and the claimed injuries arise out of those activities." *Innovative Garage Door Co.*, 2012 IL App (2d) 120117, ¶ 23 (quoting *Burger King*, 471 U.S. at 472). The *Innovative* court noted that the defendant's website was only "minimally interactive," but found that the website was "unquestionably directed (in relevant part) at Illinois" because its website specifically invited Illinois residents to fill out forms. *Id.* ¶ 26. The court emphasized that without the Internet and users in Illinois visiting the defendant's website from Illinois, the performance of the contract at issue would have been impossible based on the defendant's business model. *Id.* The court further explained that the defendant was not merely sending information to consumers; rather, it was directing them to a specific Illinois company based on the company's willingness to pay the defendant a referral fee, which resulted in the facilitation of a business transaction that might not have otherwise occurred. *Id.* ¶ 29. Finally, the court found relevant the fact that the relationship between the plaintiff and the defendant was "substantial and ongoing," due to the defendant having provided the plaintiff with approximately 150 leads per year for about 3½ years. *Id.* ¶ 27. Thus, sufficient minimum contacts existed to satisfy personal jurisdiction requirements. *Id.* ¶ 32.

¶ 21 Plaintiffs assert that the trial court misapplied the *Innovative* decision and failed to acknowledge that the case at bar deals with the ever-changing arena of on-going, Internet-based business relationships. Defendants respond that the court properly found that this case was unlike *Innovative* because that case involved far more substantial business relationships with Illinois than here, where the basis of the relationship was limited, infrequent email communication. Although the decision in *Innovative* is instructive for analytical purposes, we find the contacts with Illinois here do not rise to the same level of substantiality as in *Innovative* and, therefore, do not justify personal jurisdiction over defendants. Unlike the *Innovative* defendant, here, defendants' contacts with Illinois are too " 'random, fortuitous, or attenuated' " to justify personal jurisdiction. *Id.* ¶ 25 (quoting *Wiggen*, 2011 IL App (2d) 100982, ¶ 24).

¶ 22    Returning to the three factors that assist in our determination of whether defendants availed themselves of the benefits of doing business in Illinois, we first examine who initiated the transaction. See *Innovative Garage Door Co.*, 2012 IL App (2d) 120117, ¶ 28. The relationship between plaintiffs and defendants began sometime in 2013 when plaintiffs retained defendants for public relations services for a matter unrelated to the Kansas City event. Subsequently in 2014, plaintiffs contacted defendants in order to seek their assistance with Hallmark and the Kansas City event. It is for this event that the parties allegedly entered into an oral contract pursuant to which defendants were to provide public relations services to plaintiffs. Thus, it was plaintiffs, through their pursuit of defendants, who initiated the transaction at the center of this lawsuit. Although plaintiffs argue that defendants originally approached them, we find such an assertion to be misplaced as this factor directs us to look to who initiated the transaction. See *Innovative Garage Door Co.*, 2012 IL App (2d) 120117, ¶ 28. Thus, we find this factor weighs in favor of defendants' position.

¶ 23    Next, we examine where the contract was formed. See *id.* The evidence before this court shows that the parties solely engaged in communication via email and telephone calls. Specifically, the record contains less than 10 emails, and no evidence of the number or substance of any phone calls. There was no written agreement setting forth the terms of the alleged contract. Rather, plaintiffs' complaint states that Schecter was "verbally retained" to assist with the Kansas City event. Thus, the terms of the agreement must have been negotiated over the phone or via email, because it is undisputed that the parties never met in person regarding the Kansas City event. Additionally, unlike *Innovative*, there are no allegations that defendants' website played a part in the parties' relationship. The *Innovative* court found that the defendant's website was unquestionably directed at Illinois because it "specifically invites Illinois residents to fill out forms seeking information. Without the Internet, and without users in Illinois accessing [the defendant's] website from Illinois, performance of the contract would be impossible under [the defendant's] business model." *Id.* ¶ 26. We do not find the case at bar to be similar. Plaintiffs here just happen to be Illinois residents. Nothing about the transaction between plaintiffs and defendants was required to take place in Illinois in order for the contract to be possible. Plaintiffs could have communicated via telephone or email from anywhere in the world. The fact that they may have used the phone or accessed their emails in Illinois does not parallel the scenario in *Innovative*, where Illinois customers sought out Illinois businesses to perform handyman, plumbing, or garage door services on properties located in Illinois. Also weighing against plaintiffs is the fact that the alleged contract here was formed through telephone or email communications, not in-person negotiation within Illinois. As a result, this factor favors defendants.

¶ 24    The third factor, where performance of the contract was to take place, unquestionably favors defendants. See *Innovative Garage Door Co.*, 2012 IL App (2d) 120117, ¶ 28. There is no dispute that the event in question here was to take place in Kansas City, Missouri. Plaintiffs' complaint does not allege that any part of the contract was to be performed in Illinois. Thus, this final factor overwhelmingly favors defendants, as there is no alleged tie between Illinois and the contract's performance. Having determined that all three factors weigh in favor of defendants, we find that defendants did not avail themselves of the benefits of Illinois law when they entered into the alleged contract with plaintiffs.

¶ 25    As a final note, although plaintiffs argue that *Innovative* was misapplied and the trial court failed to recognize the ever-changing nature of Internet-based relationships, we find their

contention unconvincing. The trial court stated in its July 14, 2015, order, "[*Innovative*] is clearly of no help to plaintiffs in this case" as the court's focus there centered on the defendant's website. We agree. Here, defendants are not alleged to have maintained a website or targeted plaintiffs into using their services through a website; thus, as discussed above, the purposeful availment issue heavily weighs against plaintiffs. Merely because the parties here used email as a form of communication does not transform what would normally be a lack of jurisdiction into a case that satisfies sufficient minimum contacts. As the Court in *Burger King* recognized:

> "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476.

Here, although defendants were not physically present in Illinois but used email to communicate, such a fact is not dispositive in light of *Burger King*'s reasoning. Our decision hinges on the fact that defendants did not purposefully direct their efforts at Illinois residents. Rather, as more fully explained above, plaintiffs just happened to be residents of Illinois with whom defendants entered into a transaction unconnected with this state. The facts here sharply contrast with *Innovative*, where the defendants engaged in the purposeful direction of efforts to Illinois residents through their website. As a result, defendants do not possess sufficient minimum contacts with Illinois; requiring them to litigate here would offend traditional notions of fair play and substantial justice.

¶ 26                                    III. CONCLUSION

¶ 27        Based on the foregoing, we find that the trial court properly granted defendants' motion to dismiss for lack of personal jurisdiction, and we affirm its decision.

¶ 28        Affirmed.